We will hear oral argument in this morning as United States v. DeLia, docket 17-7051. Counsel, when you're ready. May it please the Court, my name is Bob Wyatt and I represent Dr. Stephen DeLia. Your Honor, we are here this morning asking the Court to reverse the conviction of Dr. Stephen DeLia in the Eastern District of Oklahoma where he was charged with a single count of health care fraud. Dr. DeLia was accused of violating the law from February 2010 through November of 2010. These charges were not brought until June of 2016, which is clearly beyond the five-year statute of limitations under the general statute of limitations. We have raised basically three issues, Your Honor. First of all, that the and there's a sub-issue with respect to that. Number two, we have argued that Dr. DeLia was denied in some respects his rights to self-representation under the Sixth Amendment and the Feretta decision and that the evidence was insufficient to convict Dr. DeLia in this particular case, specifically with respect to the intent to defraud and the intent to deceive the required elements of the health care fraud. Respectfully, Your Honor, we recognize that there is a unique aspect to this case and because of that, I'll start with the statute of limitations. I don't believe there's any dispute that it was beyond the five years. What we get to is whether the WSLA, the Wartime Suspension of Limitations Act, would extend the time by which the prosecution could, excuse me, the government could prosecute Dr. DeLia. Respectfully, we submit that it doesn't and that it doesn't for two or three reasons. First of all, the argument here that, well, let me back up. Let's go directly to the requirements of the WSLA. The WSLA requires specifically that in order for it to be triggered, that there must be an offense involving fraud against the United States or an agency of the United States. Two, that the offense was connected, excuse me, committed in connection with any real or of war. Clearly, the second two subsections do not apply, so we're only limited to the question of whether there was fraud against the United States or an agency of the United States. It's simple to look at the indictment of this case and when we look at the indictment, the grand jury returned an indictment that said very clearly that the property that was at stake here was property owned by and in control of and in possession of the Oklahoma Health Care Authority. The Oklahoma Health Care Authority is a state agency. There's no dispute about that. That was the evidence, that was the testimony, and that was the indictment. And what we have suggested to the court below and, again, arguing here is that the WSLA simply cannot be triggered when we have a situation involving a state agency. The War Powers Resolution Act was amended in 2008 and was amended to protect against the type of fraud involved in Iraq and Afghanistan. And specifically in the legislative history, they address the fact that the government needs time to investigate those simply because it's the first time in history where private enterprises have been significantly involved in the actual prosecution of the war. And here we have a doctor in rural Oklahoma who is accused of health care fraud by the federal government based upon allegations that he violated the health care fraud statute. Now, the government simply takes the position that, well, it's Medicaid and, accordingly, it's federal money. Well, there's no evidence to support that. The evidence doesn't support that from what was alleged in the to the jury. What we have was very specific claims that SoonerCare is a state agency. It is not a federal agency. We have a provider agreement. The provider agreement was between SoonerCare, which is a state agency established by Title 63, Section 5003 of the Oklahoma Statutes, and the SoonerCare provider agreement was between Dr. D'Elia and SoonerCare. We also have this statute which says that SoonerCare was developed to provide medical benefits for those dependent on the state of Oklahoma, not on the United States government. We also have Section 5006 of Title 63, which says that the purpose of the SoonerCare is to provide for state purchase, not federal purchase. There is nothing at the district court level which suggests that the United States was defrauded. The evidence was simply that it was the state of Oklahoma who was defrauded. We can even carry a state's budget. The state's budget is significantly funded by the federal government, right? Your Honor, there would be no doubt that there would be money that comes from the federal government into that budget. So if the state was defrauded, it's hard to know on tracing of money whose money it is in the coffers, but I guess the federal government gives specific money to the state to help administer this program, right? As I understand it, it is a grant to the state of Oklahoma. So how do you know whether the money that was paid out by fraud, allegedly, was that money that the federal government gave the state to help fund, or alternatively, the money that the state funded on its own? Well, Your Honor, I can't point to anything on that. I'll be honest with you. But what we have to look at is what was the source of the money at the time of the so-called crime? The source of the money was the state of Oklahoma, SoonerCare. SoonerCare is provided an allotment every so many months. That money is provided to the state of Oklahoma, who is not required, by the way, to participate in Medicaid, in the Medicaid program. The Medicaid program is something that is optional by the state. It is managed care. Right, but if they do provide it, which they did, then the federal government provides some of the funding. So if that money was stolen or received under false pretexts, wouldn't that affect the government, although it's awfully hard to trace back whose money it was that was stolen? Well, Your Honor, I can see how that argument can... By stolen, I don't mean literally, but I mean, you know, taken without proper representation, false representations. I understand how that statement can be made and how you can make that leap. But what we're suggesting to the Court is that that is a leap that is not appropriate. First of all, the money is... First of all, there was no evidence as to where this money came from. So the government hasn't proven that. So let's start with that. But if we skip that part and move to the next part of your question, then we get to the issue of who was administering the money, who was taking care of that, what were their responsibilities. The state of Oklahoma determines the reimbursement rates. They determine what is reimbursable. They determine what money is provided. They have the rules and regulations with respect to how they're going to administer the contract. They develop the contract, and that contract is unique to the state of Oklahoma and is uniquely associated with these parties, not with the United States government. So if that money was obtained by fraud or just, let's assume simply, just stolen, and Oklahoma called the federal government and said, you know, that money you sent us to administer this program, well, it got stolen or it's missing. Would you please send us more money? The U.S. send more money? No. In other words, the U.S. wasn't going to be out any dollars regardless of whether this money was stolen or not. The U.S. had made its payment, and it wasn't going to pay any more money because the money was stolen or was misused or wasn't misused. No, I'm not aware that there would be any reimbursement by the federal government to the state of Oklahoma. It's my understanding that the money is allotted to the state as a grant, and that as a grant, the state of Oklahoma has the exclusive possession, ownership, and control of that money. And while there may be certain regulations that they have to follow and there are certain accounting requirements, that money belongs to the state of Oklahoma. And the evidence in this case, both presented to the grand jury and found by the grand jury, is that the property was owned by the Oklahoma Health Care Authority, that that property was in the possession, custody, and control of the authority, and that it was the authority that was the victim of this particular crime. And just so I'm sure that I'm following your argument. Yes, sir. Section 1347, the first element is a scheme or artifice to defraud a health care benefit program and sooner care would qualify. Correct. Right. Okay. You're just talking about when you say United States Agency, you're talking about the statute of limitations. I am. Yes, sir. Exclusively. Yes, sir. Yes, sir. But for the health care benefit program, you're correct. A program could be a state funded program. It could be a federally funded program. It could be a private company. Any type of public or private program could fall into the definition. I think it's Title 18, Section 24, which applies to Section 1347. And that is a very real consideration here because Section 1347 does not anywhere in its elements require defrauding the federal government, which the WSLA does specifically require that the fraud be against the federal government. Now, I recognize that the WSLA was modified in 2008, but in Bridges, the federal, excuse me, the United States Supreme Court said even at that point that there must be a fraud against the United States. And the amendments in 2008 do not take that away. I don't want to limit my argument simply to the WSLA. I'm happy to answer any additional questions. But with time moving on, I want to get to the FREDA issue, unless the court has something else they want to address on the WSLA. Well, actually, before I do, I do want to point out two quick things. One, United States v. Cooper, I think is critical to us. And two, the Planned Parenthood case, which was raised by the district court and was the only Medicaid case found anywhere in American law in any published opinions that I could find. That case, though it has not been specifically reversed, was a 2014 case out of the district court of Texas, Southern District of Texas. And in that particular case, it was decided in 2014. And I would simply point to the court that even though not specifically reversed, in Kellogg-Brown en route v. United States, which was decided by the government, the United States Supreme Court in 2015 specifically said that the WSLA does not apply at all to civil cases. So, I would argue that the Planned Parenthood case is severely limited and has probably no meaning at all, simply by the fact that the Kellogg case would have reversed it. I see that I only have two and a half minutes left, so I will reserve that for rebuttal. May it please the court. I am Linda Epperle. I am an assistant United States attorney in the Eastern District of Oklahoma in Muskogee. I represent the government. We are here today, Your Honors, regarding Dr. D'Elia. Dr. D'Elia, who decided that he could afford to be away from his law practice for a period of about seven months in 2010. And during that time, he relied upon his nursing staff to issue Schedule II prescriptions, which is a violation of his rules and regulations of the Oklahoma Medical Licensing Board. So, discipline him, take away his license, whatever else, that doesn't amount to a Federal violation necessarily. You're correct, Your Honor. Where it became a Federal violation is when he submitted claims and was paid by SoonerCare, which is the entity that oversees and administers Medicaid in Oklahoma. And when he submitted those claims, he submitted them under a contract that he was required him to follow and provide a standard of care consistent with the rules and regulations of the Medical Board. He failed to do that by allowing his nursing staff to issue Schedule II prescriptions, which is outlawed in Oklahoma, and by failing to appropriately supervise his physician's assistant, even as to those prescriptions she might have been able to write. He knew this, Your Honor. The contract that he signed stated, and this is at page 944 of the appendix, the contract stated payments from the Oklahoma Health Care Authority would be paid, and quote, satisfaction of all claims will be from Federal and State funds. Any false claims, statements, or documents, or any concealment of a material fact may be prosecuted. And without going into... What you're reading from, again, give me the site to what that, what it is you just read. That is appellant's appendix... No, not the record site, but what is the document you're reading from? This is from the contract that was entered into between D'Elia Medical Clinic and the Oklahoma Health Care Authority. I believe it is Government Exhibit Number 4. That's not an agreement with the Federal Government. No, Your Honor. No, Your Honor. There's not going to be in any Medicaid case arising in Oklahoma, and I would submit without having done a big study, of any state that's going to be with the Federal Government. Do you agree that if somebody just came in with a mask and a gun and robbed the Oklahoma Committee, I mean, the Oklahoma Health of $100,000, and you call the Federal Government and said, please give me another $100,000 because your $100,000 was stolen, would you get extra money from the Federal Government? I can't answer that question, Your Honor. And the record can't answer it. No, the record certainly cannot. It looks to me like this is money the Federal Government gave to Oklahoma and lost title to it, lost control of it. It got commingled and it now became Oklahoma's money, not the Federal Government's money. So I am having trouble with this for WSLA. I understand, Your Honor. And this is an unusual WSLA case. I think given the fact that the District Court identified one instance of a Medicare situation, albeit civil, there are other examples that we could find that I believe recited in the briefs where it was applied to a commodity credit or another organization such as that. But the fact of the matter is, is that the Medicaid system as cited at pages 35 to 36 of our brief is an important system in the Federal Government. One in five people are on that system at some point within any given year. Well, it is, but the question is whether the Federal Government retained the money after they gave it to Oklahoma or whether it now became Oklahoma's money and if Oklahoma lost it, that was Oklahoma's problem. And if it was Oklahoma's problem, then it's hard for me to see how money was taken from the Federal Government. I understand, Your Honor. There are a few things the Court might look to. First of all, even though the funds have actually been deposited with the State of Oklahoma, the Federal Government still maintains a number of controls about how that money is spent, the services that can be spent on, and the standards that must be met in order for that money to be paid. And that can be seen in these same contracts that the prudent husbanding of a program. I mean, it's what the Federal Government does with highway funds and everything else. They don't give their money away and don't require some regulation, but they still give their money away. And so even on the state highway, if you gave money to the state highway, the Federal Government is going to supervise it, but if the money is stolen, is that U.S. money or is that state highway money? Your Honor, I believe that there is a case, and I'm searching for the citation, where the War Suspension of Powers Act actually was applied to a state highway funding case. I believe it's Prosperi case, Your Honor. 573 Fed Supp. 2nd at 436 District of Massachusetts, involving highway construction funds. Here... So is it District of Massachusetts, is it a Fed Supp. or a Fed 2nd? I'm sorry, Fed Supp. Fed Supp. 2nd. So that would be an example where highway funds certainly did fall under this. And we think that the case law is certainly there. The importance and Federal nature of the Medicaid program, even though it's all administered through states, like many programs are these days, as Congress attempts to allow the states to work these Federal programs in the way that works best for the citizens of those states, I think the courts will increasingly see programs that appear to be state programs only, but are in fact sort of a hybrid, a Federal and state connection. But even if this Court were to reject the trial court's finding under the Wartime Suspension of Limitations Act, the filing here was authorized by the waiver that was signed by this defendant. Waiver was signed outside the statute of limitations? Yes, it was, Your Honor. Do you have any authority that would indicate that we could enforce a waiver that was seeking to see the language of the waiver? As I recall, you know, the waiver he waived his right to have charges brought against him within the applicable statute of limitations period, and it said that he desired to extend the period during which such charges may be brought. Isn't that by implication assuming it hasn't already expired? Yes, I think it does. I mean, there was no question but that the statute had expired. However... I'm sorry. It said the opposite. To me, it seems that when he was signing this waiver, the presumption was it hadn't yet expired and he was agreeing to extend it. Well, that... And in fact, it had already expired at the time you signed the waiver. It had expired certainly as to the conduct that we eventually charged him with. Right. However, he was being looked at for, you know, a wide range of time. There's implication, I think, there that the conduct that was being looked at ranged from 2010 to 2011, that I think that that waiver also cites that there was a five-year statute of limitations. He was represented by retained counsel. He would tell anyone that would listen that he was highly intelligent himself and well-educated. That's not really relevant. I guess I'm asking you, do you have any authority that would indicate that a waiver signed after the limitation expired for the charges that are eventually brought is enforceable? I do not have a case. I didn't see any. I do not have a case, Your Honor, and I haven't found a case one way or the other. We have not located a case that said that a waiver is valid or that it is invalid. It's a remarkable proposition that a statute of limitations can run and yet the government can charge whenever it can get a potential defendant to sign a piece of paper. That's good policy? It is the policy the courts have recognized, Your Honor, by the Supreme Court decision in Musacchio in 2016, which found that the statute of limitations is not a jurisdictional defense. It does not become a part of any case unless the defendant raises it. And what the defendant waived here was not just the statute of limitations. What he waived specifically was the right to assert that defense. So he wasn't extending the statute of limitations. He was saying it's discretionary. I can file it or not file it, no matter how valid it is. And I'm agreeing about a trial behavior I'm going to undertake, which is not to assert the statute. There is a Tenth Circuit case that, in a different context, that drew that distinction. Thank you, Your Honor. That is precisely what we're saying, that he made the decision, for whatever reason represented by his counsel, that he would execute this waiver and give up the right to raise that as a defense. Now, if the statute of limitations were still considered jurisdictional, as it may have been under this Court's decision in 1992 in Cooper, we might have a different result. But here it's clear that the statute of limitations is no longer jurisdictional, not an issue unless the defendant raises it. The defendant agreed not to raise it. And that waiver, Your Honor, should cover the United States and this conviction, even if the Wartime Suspension of Powers Act is found inapplicable. We further, Your Honor, would argue that the trial court here did the correct thing as far as the self-representation. I know that this wasn't discussed, but I'd like to just state that the application to change back to pro se after having been represented at Vore Dyer, questioning witnesses himself on day one, at the end of day one, switching back to retained counsel, at the beginning of day three, he wanted to slip again. And as patient as Judge Payne is in the Eastern District of Oklahoma, that was just too much. Well, but you have one out-of-circuit case that says you got less right to go back to representing yourself after you've waived it once. But putting that case aside, the case law is generally that we give a very heavy presumption of allowing a defendant to assert his self-representation, right? That is correct. I mean, it's – and it causes a problem for district courts. But I think it's represented in that unpublished ranking decision. Well, how – why would this have delayed things? He had already been, I guess – I mean, why couldn't the court have been pretty seamless about it and said, fine, you go back to representing yourself and have advisory standby counsel if you want to use him again? There were two – three reasons, Your Honor. First of all, he does not have the right in this circuit to have hybrid representation with standby counsel and himself just willy-nilly – Well, he didn't have that right, but the court could have granted it. The court could have, but he does not have a right to that. No, he doesn't have that right. But the counsel was there and counsel had been advising him before when he was representing himself, so there would be every reason to expect the court would have discontinued that relationship. Okay. The problem, Your Honor, for two reasons. First of all, the request was no longer timely. After the time that meaningful procedures had begun, a request for pro se representation is not timely, and certainly here, by the third day of trial, meaningful procedures had begun. The court also was warranted – would be warranted in finding that the defendant was not able or willing to abide by the rules of procedure and courtroom protocol. During the time that he questioned witnesses during the first day, there were problems with him testifying instead of actually questioning witnesses, with him revealing inadmissible hearsay in the course of his comments and questions, with him interrupting witnesses, and there was beginning to be a complete failure to follow the protocol that the court laid out for the orderly administration of justice. And that is also a concern that the district court has here. I think that in reading the record as a whole, this defendant's behavior deteriorated during this trial to the point that he was not even present for much of the closing argument after throwing a small fit. But all of that, the real deterioration, the outbursts and so forth, that happened after he was denied his right to represent himself again. How much of that behavior occurred before that second denial or the ultimate denial of his right to represent himself? He was refusing to correctly address the court. He was continuing to speak when the trial court told him not to. The, without specific citations to the record, there were developing problems with him and his ability to. So is that whole transcript before us? Yes, Your Honor. The whole transcript is. Can I ask you to switch gears real fast and let you address something that's bothering me, which is the health care fraud cases that I've seen have involved false billings. Yes. Or people who aren't even clients or double billing for those sorts of things. Here, I don't think that there's evidence that any of that went on. Instead, what the claim is, is that he was allowing his physician assistant simply to sign his already signed pads and make prescriptions for people, primarily pain medication. But if all of those people, if the treatment was correct, and I think the evidence was that his billings did not go up from the time that he was gone and when he was there, then how is that health care fraud in the traditional sense that our cases speak of? It is health care fraud, Your Honor, to the extent that he is submitting claims for services that fall below the standard of care. Here, not only is his physician's assistant issuing prescriptions, and I notice I'm out of time. May I continue to answer your question? His physician's assistant issued during that time about 1,491 prescriptions, unsupervised. However, during that same time period, his LPNs, who have no prescribing authority in Oklahoma, issued over 2,700 prescriptions. And so while he's not billing for non-existent patients, he is off cruising the rivers of Europe billing for visits that look like he is there when he should be there to render proper care. And I know that the defense argued that there was not any danger, but we think that, you know, we don't have the charts for every single one of these patients, but we know that at least one of his employees was harmed because she wrote prescriptions for herself. Based upon all this, we'd ask that the convictions be affirmed. Fifth Court, please. Two or three quick things. With respect to the waiver, first of all, I would note that Judge Payne found that the waiver was moot, so that issue was not fully addressed by the district court. The second thing I would address is, like you did, Judge Moritz, if we look at paragraph three, those statements in paragraph three of the waiver specifically imply future events, that it would be prohibited after the period of five years if certain things happen. And if they were to expire during the period agreed upon in this document, then you would waive. Well, if we carry that forward and go from paragraph three to paragraph eight, in paragraph eight, it says, being fully advised in these premises, I knowingly and voluntarily waive the statute of limitations for the period from the date of his execution, Dr. DeLea's execution of this waiver, through and including July 31, 2016. That statement can certainly be read to say, I'm only authorizing any expiration that occurred between that period of time, not anything that has previously expired. Also, I would argue there's no language in there, and I agree not to assert statute of limitations as a defense. There's no language like that. Pardon me? There's no language to the effect that I agree not to assert the statute of limitations as a defense in any later case brought against me. That's correct. And what we're looking at is that's almost fraud in the inducement. And that'd be like saying, you know, I'll sell you the Brooklyn Bridge, but I don't own any share of it. But I'm going to do that. Here, that's what he was sold. He was sold a bill of goods. It was already passed the statute of limitations before the date of this document. Secondly, with respect to Masaccio and Cooper, Cooper, excuse me, Masaccio does not overrule Cooper. If the court looks carefully at the Cooper decision, they refer back to the Waters decision. And in the Waters decision, that's where the language jurisdictional was used with respect to the statute of limitations. But in the Cooper decision, the court, this court said, while we use the word jurisdictional in our assessment of the scope of the statute, we focused upon its plain language and conducted and concluded that it operates as a bar to prosecution. The court did not equate the statute with the concept of subject matter jurisdiction, and we do not believe such a parallel exists. So Masaccio doesn't change any way of how this court has treated it. And this court has said specifically, again, in that case, that to hold that the statute of limitations doesn't apply would simply change the statute of limitations from a law to a mere suggestion. And we would submit to the court that the statute of limitations argument is still valid. I see that I'm reaching my six minutes. I know that the government went 49 seconds over. May I continue? You can finish your thought, but I think additional time was added. Is that right? Did you add additional time or not? Okay. All right. Please try to wrap it up in the next 30 seconds. I will, Your Honor. With respect to the statute of limitations, excuse me, with respect to the argument of McCaskill on the self-representation, if we look at McCaskill, it's important that in McCaskill it says that even though the standby counsel has participated, there can become a situation where the defendant can articulate reasons why that needs to change. It says until an argument has been made. Dr. D'Elia very clearly articulated why in this particular case it needed to stop and needed to stop right then. And what he said was, I wanted my character at issue. I wanted to present character evidence. He did present character evidence through himself because he later testified, but his lawyer refused to put on that character evidence, which may have been helpful to him. His lawyer refused to question witnesses the way he wanted them questioned. So he articulated to Judge Payne exactly why that needed to be done. In addition to that, Judge Payne very clearly said, we, I don't think he has the skills to do this and that's not the standard. The standard was whether he was competent to make that decision. Your Honor, for all of the reasons cited within our brief, we would ask this court to reverse the convictions and remand it with instructions to dismiss or for a new trial. Thank you both for your arguments. The case is submitted and the court stands adjourned until 830 o'clock tomorrow morning.